**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **YOKOGAWA CORPORATION OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No.   4.23-cv-187 |
| **STEVE CAMPBELL**, | |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff Yokogawa Corporation of America ("**Plaintiff**" or "**Yokogawa**"), by and through its undersigned counsel, hereby brings this Complaint for injunctive relief and money damages against Defendant Steve Campbell ("**Campbell**" or "**Defendant**"), and states as follows:

## INTRODUCTION

1.      Yokogawa brings this lawsuit because Steve Campbell resigned his employment on December 12, 2022, right after he had reached out to the Yokogawa customers whom he had serviced to state that he was "simply changing teams," would remain in the same line of business (servicing customers in the Gulf Coast in the energy sector [especially liquid natural gas ("**LNG**")] with their needs relating to control systems), and that he would be reaching out to them in January 2023 when he had joined a competitor.

2.      Campbell's telegraphed course of action will be in direct violation of his obligations under the Employment Agreement (the "**Agreement,**" attached as Exhibit 1) that Campbell signed as a condition of his continued employment and exposure to confidential information, as well as the payment of substantial incentive compensation by Yokogawa.   The Agreement prohibits

Campbell from soliciting business from the customers with whom he had a connection at Yokogawa.

3.    The Agreement also prohibits Campbell from: (a) using, disclosing, or retaining any of Yokogawa's trade secrets or confidential information; (b) keeping Yokogawa's property after the end of his employment or (c) transferring business information from Yokogawa's system, hardware, or software to an external device in advance of the end of his employment.  Campbell brazenly violated those provisions as well.  Contemporaneously with his resignation, Campbell attached numerous USB storage devices to his Yokogawa computer:

| Serial/UID | Description | First Connected | Last Connected | Last Disconnected |
|---|---|---|---|---|
| NA7TMJM8 | Seagate BUP RD SCSI Disk Device | 9/7/2022 12:32 | 11/24/2022 15:43 | 11/24/2022 19:30 |
| NACMFZBL | Seagate Portable SCSI Disk Device | 10/15/2022 15:23 | 12/11/2022 22:01 | 12/12/2022 13:27 |
| 9207007561925640000 | VendorCo ProductCode USB Device | 5/16/2022 8:45 | 12/13/2022 12:50 | 12/13/2022 12:51 |
| 001CC0EC2F39EA11D6C900C1 | Kingston DataTraveler 2.0 USB Device | 12/13/2022 9:09 | 12/14/2022 7:44 | 12/14/2022 9:51 |

4.    Campbell used these storage devices to take large quantities of Yokogawa information.  For instance, he created and moved .pst files containing untold numbers of Yokogawa emails and attachments, to the Seagate with serial number NACMFZBL (the "**FZBL Seagate Portable Drive**") on December 3 and 10, 2022.  Around the same time, Campbell deleted large quantities of emails and files to make it harder to Yokogawa to pick up where he left off.

5.     Unaware that Campbell had taken its trade secrets, Yokogawa reached out to Campbell to remind him of his obligations under the Agreement and to require that he return all Yokogawa materials in his possession.  (Exhibit 2.)  Campbell did not address his contractual obligations at all.  When asked for the name of his new employer, Campbell stated "All shall be aware in 2023."  (Exhibit 3.)

6.     Additionally, Campbell returned only one storage device (the Seagate with serial number NA7TMJM8), despite the fact that he attached no fewer than 13 USB storage devices to his Yokogawa computer since September 2022.  Specifically, the FZBL Seagate Portable Drive contains numerous .pst files, Campbell's Yokogawa Outlook Contacts, a Word document titled "LNG Notes," a proposal for Dyno Nobel (a Yokogawa customer serviced by Campbell), and numerous additional LNG documents:

| |
|---|
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\CW Notes.docx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\CVX LNG.pptx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\Cheniere MAC External.pptx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\ND LNG.pptx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\LNG ppt.pptx |
| My Computer\D:\PC Alpha\Desktop\LNG D\LNG Introduction - Yokogawa.pptx |
| My Computer\D:\PC Alpha\Desktop\LNG D\1_Overview LNG.pdf |
| My Computer\D:\PC Alpha\Desktop\LNG D |
| My Computer\D:\PC Alpha\Desktop\LNG D\Presentation1 - LNG.pptx |
| My Computer\D:\PC Alpha\Desktop\LNG D\LNG Process.docx |
| My Computer\D:\PC Alpha\Desktop\LNG D\LNG Processing.pdf |

7.     Taken together, Campbell has embarked on a course of conduct wherein he is in position to use Yokogawa trade secret and confidential information to move to move some or all of the substantial customer base that he serviced for Yokogawa.

FP 45995918.4

8.      Campbell is violating his non-disclosure and return of property promises with abandon.  He has also stated a clear intent to violate his non-solicitation obligations by telling Yokogawa customers that he was going to reach out to them in the coming year.

9.      Uncovering this misconduct has left Yokogawa no choice but to file this lawsuit to protect itself from the damage that will be caused by Campbell's actions.  Campbell is trying to deny Yokogawa the benefit of its bargain stealing the business that he serviced.

10.     This Court should enjoin Campbell to force him to refrain from using, disclosing, or retaining the trade secrets that he stole, which have value because Yokogawa has them and its competitors do not.  Those secrets would lose their value if Campbell used them to solicit and divert Yokogawa customers way from Yokogawa, or if he disclosed them to a competitor.  It should also enjoin him from soliciting either the Yokogawa customers covered by the Agreement or his former co-workers.

11.     It is impossible to put a precise value on the customer relationships that Campbell is seeking to steal using the trade secrets because Yokogawa cannot know how long it would have kept the relationships or what additional work would have spun off of them.  Injunctive relief exists precisely to prevent parties like Yokogawa from being put in this position of having its critical intellectual property used against it and its contractual rights disregarded.

## PARTIES AND JURISDICTION

12.     Yokogawa Corporation of America is a corporation organized under the laws of Delaware and is authorized to do business in the State of Texas.  Its corporate headquarters are located in Sugar Land, Texas.

13.    With international subsidiaries in Canada and Mexico, Yokogawa's products and services affect interstate and foreign commerce because its employees serve non-resident customers across the United States and internationally.

14.    Steve Campbell is an individual who is a resident of Florida living at 1912 East Yonge Street, Pensacola, Florida 32503.

15.    Personal jurisdiction is proper in this Court because the Agreement contains a forum selection clause stating that any action arising out of or relating to it will take place in the state and federal courts of the State of Texas:

> Exclusive Jurisdiction and Venue. You agree that any claim arising out of or relating to this Agreement shall be brought exclusively in the state or federal courts of competent jurisdiction located in the state of Texas. You consent to the personal jurisdiction of such courts and thereby waive: (a) any objection to jurisdiction or venue; or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Ex. 1, ¶ 22.

16.    Campbell had numerous ties to the Houston area during his employment, as he was supervised by personnel at the Sugar Land office, he worked closely with and was supported by Sugar Land personnel, and he regularly traveled to the Sugar Land office for work.

17.    This Court has jurisdiction over the non-Agreement claims because the trade secret claims against Campbell relate to the Agreement as Campbell stole trade secrets that Yokogawa protects with the Agreement.   Additionally, The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal question claims that they form part of the same case or controversy.

18.    This court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Yokogawa is bringing a claim for trade secret misappropriation pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq*.

19.     This court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy is more than $75,000.

20.     Venue is proper in this Court because of the aforementioned forum selection clause.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.      Background and Business of Yokogawa

21.     Yokogawa is a world leader in industrial automation and test and measurement solutions.  Among other services and products, Yokogawa provides its customers with service and support for control systems, including service, maintenance and training for customer personnel.

22.     Part of Yokogawa's success is based on the solutions that it provides to numerous different industries.  One such business is the LNG supply chain.  Yokogawa has been engaging in LNG automation by supplying the latest sensors, analyzers, and control and information systems for decades. Yokogawa is one of the biggest automation suppliers to the worldwide LNG supply chain, performing services in the areas of liquefaction, transportation, and regasification.

23.     Yokogawa provides a host of solutions to customers in the LNG space, including: (a) helping them comply with legal requirements through production systems, process analyzers to measure emissions, and security consulting services to protect against cyberattacks; (b) engineering assistance with respect to control systems; (c) ensuring that plants remain operational while making changes; and (d) digital transformation.

### II.     Yokogawa's Trade Secrets

24.     Equally critical to Yokogawa's success, however, is its investment into the development and safeguarding of the confidential and trade secret information central to the business platform. Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures,

FP 45995918.4

Yokogawa protects its prized assets – the trade secret and confidential information acquired and developed through continued investment.

25.     Yokogawa devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Yokogawa. As alleged herein, Yokogawa treats such information as its trade secrets (hereinafter referred to as "**Trade Secrets**" or "**Yokogawa Trade Secrets**"):

    a.  All information concerning Yokogawa customers, including customer needs, service histories, pitches, and contact information;

    b.  Yokogawa's results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods;

    c.  Yokogawa's services and products offered by Yokogawa to its customers or prospects, including, but not limited to, equipment information, customer service offerings, and product materials; and

    d.  Personal identifying information, job history, qualifications, training, specialties, strengths, weaknesses, evaluations, customer contacts, contractual obligations, pay data, salary and commission information, job responsibilities, account responsibilities, customer satisfaction, employee turnover or retention, or other business-related information of Yokogawa employees.

26.     Yokogawa developed, compiled, and acquired its Trade Secrets at great expense and through substantial efforts. Yokogawa's Trade Secrets are not readily ascertainable in the industry or in any type of trade or public directory or any other source.

27.     The misuse of Yokogawa Trade Secrets, whether through the improper disclosure or improper use for a non-Yokogawa business purpose, would cause significant damage to Yokogawa through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

28.     As such, Yokogawa takes careful, deliberative actions at great expense to protect against the misuse or wrongful disclosure of Yokogawa Trade Secrets.  Yokogawa has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as: (a) emphasizing to employees Yokogawa's need to keep this information a secret; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Yokogawa; (c) having employees execute confidentiality and non-disclosure agreements that instruct Yokogawa's employees not to disclose, reproduce or use this information without Yokogawa's consent; (d) distributing confidentiality policies to all employees through company handbooks the receipt for which must be acknowledged by the employee; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Trade Secrets on Yokogawa's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Yokogawa's computer system, servers, and networks, encrypting Yokogawa laptops issued to employees, and requiring that Trade Secrets be kept in secure locations when not in use.

29.     Yokogawa also guards the confidentiality of its Trade Secrets by enforcing its contracts protecting its Trade Secrets.  Yokogawa does not tolerate violations of confidentiality

provisions and takes steps to enforce its rights, from cease-and-desist letters to litigation seeking emergency or preliminary and permanent injunctive relief.

30.     Because of the nature of the Trade Secrets, Yokogawa's commitment to enforce its confidentiality agreements, the fact that the Trade Secrets derive value by virtue of being confidential, and the fact that the Trade Secrets cannot be obtained from public sources by competitors, Yokogawa's Trade Secrets are trade secrets under federal and state law.

31.     In the course and scope of his duties as a Senior Account Manager for Yokogawa, Campbell had access to, regularly used, and was responsible for maintaining and safeguarding Yokogawa Trade Secrets from use and disclosure for a competitive purpose.

**III.     Campbell Signs the Agreement in Return for Valuable Consideration.**

32.     Campbell joined Yokogawa in June 2008.  For the last five and a half years of his employment, Campbell worked as a Senior Account Manager, which means that he worked directly with Yokogawa customers to provide maintenance and support services.  Because of the nature of the services that he provided, maintaining strong relationships with customers was critical, and prompt and regular communication with them was vital.

33.     Among Campbell's job duties were the following tasks:

- Pursuing strategic purchase agreements with key accounts;

- Forming business alliances with key partners;

- Preparing and developing strategic business plans for target industries;

- Participating in regular reviews for assigned accounts to review progress against commitments; and

- Expanding Yokogawa's presence within existing accounts and penetrating competitive accounts.

34.     Campbell worked for Yokogawa out of his home in Pensacola, Florida.   He specialized in taking care of Yokogawa's Gulf Coast industries (refining, chemicals, offshore Production, LNG) customers around the Gulf of Mexico ("**Gulf Coast Industries Customers**").

35.     Gulf Coast Industries Customers require constant attention and care from Yokogawa account managers because the nature of the business is such that the customers frequently need new equipment or service to their existing equipment so as to ensure that accurate measurements are made and that operations run safely and efficiently.  As a result, Campbell had substantial customer contact on behalf of Yokogawa and gained a sizeable amount of confidential information about the businesses that he serviced.

36.     By the end of his employment, the customers that Campbell was servicing on behalf of Yokogawa generated eight figures in revenue for Yokogawa.  Additionally, based on the projects that Campbell referenced at the end of his employment, the LNG vertical in which he was working contained nearly nine figures in revenue opportunities.

37.     Campbell's salary as of the end of his employment was in the six figures annually, which does not include the variable compensation that was available to him based on hitting productivity goals.

38.     As a condition of the continuation of his employment (and thus his exposure to Yokogawa Trade Secrets and other confidential information) and of his participation in the Yokogawa sales incentive plan (through which Campbell made an additional six-figure sum in 2020-22), Campbell signed the Agreement on November 11, 2019.

39.     In Paragraph 4 of the Agreement, Campbell committed that he would not do any of the following:

(i)     either during or after Your employment with the Company, use or disclose the Trade Secrets or the Confidential Information for any purpose other than the

performance of duties in the Business on behalf of the Company, except as authorized in writing by the Company;

(ii)    during Your employment with the Company, use or disclose: (a) any confidential information or trade secrets of any third party; or (b) any works of authorship developed in whole or in part by You for any other party, unless authorized in writing by the third party; or

(iii)    upon the conclusion of Your employment with the Company, for any reason, retain Trade Secrets or Confidential Information, including any copies existing in any form (including electronic form) that are in Your possession or control. This includes customer information on any social media account that You utilize on behalf of the Company. You agree to: (1) maintain the privacy settings on any social media account such that competitors cannot access customer information on said accounts; and (2) delete (within three days of the close of Your employment with the Company) all customer information that You add to any social media accounts during the course of Your employment with the Company. This restriction is in addition to those found in the Company's Social Media Policy, with which You agree to abide.

(Ex. 1 ¶ 4.)

40.    In Paragraph 5 of the Agreement, Campbell committed that he would not solicit certain Yokogawa customers:

Non-Solicitation of Customers. During the Restricted Period, You will not directly or indirectly solicit any Customer of the Company for the purpose of selling or providing any products or services competitive with those offered by the Company. The restrictions set forth in this Section apply only to Customers with whom You had Contact. Nothing in this Section shall be construed to prohibit You from soliciting: (a) a Customer that has terminated its business relationship with the Company (for reasons other than being solicited or encouraged by You to do so); (b) a product line or service line competitive with one that the Company no longer offers; or (c) a product line or service line with which you had no involvement while working for the Company and about which you did not learn Confidential Information.

(Ex. 1 ¶ 5.)  The "Restricted Period" is defined as the employment period and then 18 months thereafter.  (Ex. 1, Ex. A, ¶ F.)  D.    "Customer" is defined as any person or entity to whom Yokogawa has sold its products or services, directly solicited to sell its products or services, or cultivated a relationship intended to increase the sales of Yokogawa's products or services in the previous eighteen months.  (Ex. 1, Ex. A, ¶ D.)  "Contact" is defined as:

11

any interaction that takes place in the last eighteen (18) months of Your employment with the Company and is between You and a Customer:

(1)    With whom You dealt on behalf of the Company;

(2)    Whose dealings with the Company were coordinated or supervised by You;

(3)    About whom You obtained Trade Secrets or Confidential Information in the ordinary course of business as a result of Your work performed on behalf of the Company; or

(4)    Who purchases products or services from the Company, the sale or provision of which directly results or resulted in compensation, commissions, or earnings for You.

(Ex. 1, Ex. A ¶ C.)

41.    In Paragraph 6 of the Agreement, Campbell agreed that he would not directly or indirectly solicit, recruit or induce any Yokogawa employee (as that term is defined in the Agreement) to terminate his or her employment relationship with Yokogawa in order to work for any other entity engaged in the business of developing, manufacturing, selling, marketing, or servicing industrial automation, test, and measurement solutions.  (Ex. 1 ¶ 6.)

42.    In Paragraph 8 of the Agreement, Campbell promised that he would return to Yokogawa all of its property in his possession at the end of his employment:

<u>Return of Company Property/Materials</u>. Upon the termination of Your employment for any reason or upon the Company's request at any time, You shall immediately provide to the Company all of the Company's property, Confidential Information, and Trade Secrets including, but not limited to, any mobile/smart phone, personal digital assistant (PDA), keys, passcards, credit cards, confidential or proprietary lists (including, but not limited to, customer or vendor lists existing in any format), tapes, laptop computer, software, computer files, external data device, marketing and sales materials, information relating to work done for the Company or that You obtained as a result of working for the Company (including such information residing on Your personal computer, personal e-mail account, social media account, Cloud account, external data device, or mobile/smart phone) and any other property, record, document, or piece of equipment belonging to the Company. You will not retain any copies of the Company's property, including any copies existing in electronic form, that are in Your possession, custody, or control. The obligations contained in this Section shall also apply to any property that belongs to a third party, including, but not limited to: (a) any entity that is affiliated or related to the

12

Company; or (b) the Company's customers, licensors, or suppliers. If You have any questions regarding Your obligations to return and not to retain Company property, then You are obligated to contact Your direct supervisor (as of the end of Your employment) to obtain guidance.

(Ex. 1 ¶ 8.)

43.    In Paragraph 11 of the Agreement, Campbell acknowledged that Yokogawa would be entitled to injunctive relief in the event that he violated the Agreement.  (Ex. 1 ¶ 11.)

44.    In Paragraph 13 of the Agreement, Campbell stated that he would not misuse Yokogawa's computer system in advance of the end of his employment:

> <u>Computer Authorization</u>. You agree that You are not authorized to use the Company's computer system or any of the Company's IT hardware or software for any purpose in actual or contemplated competition with the Company. This includes: (a) transferring information relating to the Company's Business from the Company's system, hardware, or software to an external device or account in advance of the end of Your employment; or (b) deleting information relating to the Company's Business from the Company's system, hardware, or software in advance of the end of Your employment with the Company. This restriction is in addition to those found in the Company's Internet Policy, with which You agree to abide.

(Ex. 1 ¶ 13.)

45.    In Paragraph 15 of the Agreement, Campbell agreed that Yokogawa would be entitled to recovery of its attorneys' fees in the event that it were successful in litigation to address a breach by Campbell.  (Ex. 1 ¶ 15.)

46.    Finally, in Paragraphs 17 and 22 of the Agreement, Campbell agreed that the Agreement would be interpreted under Texas law and that the sole jurisdiction for actions relating to the Agreement would be in the state or federal courts of competent jurisdiction located in the state of Texas.  (Ex. 1 ¶¶ 17, 22.)

47.    Yokogawa has complied with all of its obligations set forth in the Agreement.

48.    Yokogawa reminded Campbell of his obligations under the Agreement, first as part of its exit procedures during Campbell's departure and then in a reminder letter from its outside

counsel.  Campbell responded to the reminder letter by returning one external hard drive, but otherwise did not commit that he would abide by his contractual commitments.

### IV.    Campbell Misappropriates Trade Secrets and Violates the Agreement in an Effort to Steal Yokogawa Customers.

49.    Campbell notified Yokogawa of his resignation on Friday, December 9, 2022 with an effective date on the following Monday, December 12.  In his resignation email. Campbell listed 12 different departments at Yokogawa that had been "invaluable" in his career growth, which he then described by detailing numerous customer-specific business successes.

50.    Also on December 9, 2022, Campbell reached out to an unknown number of customers to notify them of his departure.  (Exhibit 4.)  In that email, Campbell stated the following:

> Simply changing teams and shall remain along the Gulf Coast focused on LNG and balance of Energy pursuits.
>
> My contact number remains the same – 850.384.3419.
>
> I'll update all January 2022.[1]

In this message, Campbell was communicating to the recipients that he would be staying in the same business and in the same territory.  He was also stating that he would be keeping his cell phone number and that he would be reaching out to the customers in January 2023.  In short, Campbell sent this email as part of a plan to maintain relationships with the customers and thereby move their business from Yokogawa to his new employer.

51.    Yokogawa does not know the full extent of the customers to whom Campbell sent this email because he blind copied the customers and then double-deleted the email from his

---

[1]    Given that he was sending this message in December 2022, Campbell almost certainly meant that he would be reaching out to the customer in the following month (January 2023) and not eleven months in the past (January 2022).

account such that Yokogawa does not have a copy of it.  As a result, Yokogawa does not know the complete list of its customers to whom Campbell will be reaching out this month.

52.    On Saturday, December 10, 2022 (one day after sending the solicitation email to an unknown universe of customers and two days before the end of his employment with Yokogawa), Campbell saved to the FZBL Seagate Portable Drive the following documents:

- A .pst folder titled "shellNORCO";

- A folder called "Opp Pics";

- A folder titled "YCA PST";

- A folder titled "PST 121022";

- A folder titled Contacts.CSV; and

- Three specific jpegs.

53.    On information and belief, Campbell was taking some or all of his Yokogawa emails (.pst files are used to store Outlook-based emails) and his Contacts (.csv files are used to store Outlook-based Contacts).  These files would likely contain a bevy of trade secrets regarding Yokogawa's customers, the history of Yokogawa having serviced the customers, and the contact information for the key decision-makers with the customers.

54.    For instance, on December 8, 2022, Campbell saved to the YCA PST folder a document titled "Proposal for Dyno Nobel MSS Delivery R0 A (Draft).docx," a proposal to Dyno Nobel (one of the customers that Campbell serviced on behalf of Yokogawa).

55.    The FZBL Seagate Portable Drive is full of confidential Yokogawa work materials that Campbell accessed in the final days before his abrupt resignation.  By way of example, he saved a Word document titled "LNG Notes" to the drive on December 5, 2022.  On the previous day (December 4), he interacted with the following files on that drive:

| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\CW Notes.docx |
| --- |

| |
|---|
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\CVX LNG.pptx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\Cheniere MAC External.pptx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\ND LNG.pptx |
| My Computer\D:\PC Alpha\Desktop\Commonwealth - LNG\LNG ppt.pptx |
| My Computer\D:\PC Alpha\Desktop\LNG D\LNG Introduction - Yokogawa.pptx |
| My Computer\D:\PC Alpha\Desktop\LNG D\1_Overview LNG.pdf |
| My Computer\D:\PC Alpha\Desktop\LNG D |
| My Computer\D:\PC Alpha\Desktop\LNG D\Presentation1 - LNG.pptx |
| My Computer\D:\PC Alpha\Desktop\LNG D\LNG Process.docx |
| My Computer\D:\PC Alpha\Desktop\LNG D\LNG Processing.pdf |

On the day prior to that (December 3), he had saved to the drive a different file of Outlook emails titled "Yokogawa2.pst."

56.    For instance, "Cheniere MAC External.pptx" is a 30-slide PowerPoint presentation that Yokogawa Director Nicholas Yim ("**Yim**") made to Cheniere (an LNG provider that Yokogawa serviced) executives to strengthen Yokogawa's relationship, especially regarding a direct Main Automation Contractor ("**MAC**") contract and execution strategy.  The slide deck is replete with proprietary information regarding Yokogawa's MAC offerings, the specific ways that Yokogawa would service Cheniere, and MAC projects that Yokogawa has done for other customers.

57.    Yim shared the Cheniere presentation with Campbell because Campbell was driving the LNG vertical, and they were preparing for presentations to Commonwealth LNG.

58.    This slide deck would be highly useful for a competitor seeking to take Cheniere's business from Yokogawa because it would know exactly how Yokogawa is selling its products and services such that the competitor could tailor a pitch having precise knowledge of what its rival is doing.  It would be the proverbial football game where one team has the playbooks for both sides.

59.     On Sunday, December 11, 2022 (two days after sending the solicitation email to an unknown universe of customers and one day before the end of his employment with Yokogawa), Campbell attached the FZBL Seagate Portable Drive to his Yokogawa computer for the final time. He then disconnected the FZBL Seagate Portable Drive from the Yokogawa computer for the final time on the following day, which was his last day with Yokogawa.

60.     Not content with merely taking information from Yokogawa, Campbell also deleted large quantities of information on his final day of employment.  For instance, Campbell deleted the following business-related files:

| C | | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|
| | | User | User Principle Name | App | Devi | Location | Date |
| om/personal/steve_campbell_yokogawa_com/Documents/CVX Pascagoula requesting Yokogawa contractor support | | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Predictive Maintenance.docx | | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Microsoft Teams Chat Files/SM - BHP.pptx | | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Recordings/Analytical Training Module-20220111_125630- | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Microsoft Teams Chat Files/NORCO SM - 080421.pptx | | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Yamal Learnings.pptx | | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Microsoft Teams Chat Files/MAC - TOTAL - 052121 - FOR.p | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |
| om/personal/steve_campbell_yokogawa_com/Documents/Recordings/SY30 09 Proposal Decision Review _PDR.pptx | | Campbell, Steve | steve.campbell@yokogawa.com | Microsoft OneDrive for Business | PC | United States | 2022-12-12 08:47:21 UTC |

61.     Additionally, Campbell deleted most but not all of his emails at the end of his employment.  Specifically, he purged roughly 3,625 emails that were received between Monday, October 31, 2022 and Monday, November 12, 2022.

62.     Yokogawa only became aware of Campbell's use of the FZBL Seagate Portable Drive in early January after having a forensic review performed on it.  Prior to that and based on Campbell's December 9, 2022 email to Yokogawa customers, Yokogawa's outside counsel sent a reminder letter to Campbell on December 15, 2022.  (Ex. 2.)  In that letter, Yokogawa described the covenants in the Agreement and expressed its concern that Campbell had signaled an intent to solicit Yokogawa customers.  Based on comments that Campbell had made to co-workers that he had Yokogawa business information on an external hard drive, Yokogawa also reminded Campbell that he had not returned an external hard drive and that he was required to do so.

63.     In response, Campbell sent one external hard drive to Yokogawa's counsel: the Seagate drive with serial number NA7TMJM8.  Significantly, Campbell did not return the FZBL Seagate Portable Drive, presumably hoping that Yokogawa would not notice that he had returned one drive while keeping another full of Yokogawa Trade Secrets.

64.     Campbell's decision to return only one Seagate hard drive is especially indefensible because he attached no fewer than 13 USB storage devices to his Yokogawa computer from September 2022 to the end of his employment.  The other 12 devices are presently unaccounted for

65.     Yokogawa's counsel also inquired as to Campbell's new employer.  Campbell refused to provide that information, stating only "[a]ll shall be aware in 2023."  (Ex. 3.)

66.     At no time during his correspondence with Yokogawa's counsel did Campbell respond to Yokogawa's reminder letter, state that he would comply with his contractual commitments, or confirm that he had returned all Yokogawa property.  In short, Campbell was evasive in dealing with basic requests.

67.     Some or all of the substantial customer base that Campbell serviced for Yokogawa – the very business that Yokogawa sought to protect with the Agreement – is at risk if Campbell is allowed to violate his contractual commitments and his obligations under state and federal trade secret laws.

68.     Armed with a hard drive full of trade secrets and having taken the necessary steps to compete, Campbell is poised to steal business unless this Court requires him to live up to his promises.

69.     Yokogawa's trade secrets have substantial value precisely because they are not known to competitors.  The contents of the FZBL Seagate Portable Drive would be dangerous in

Campbell's hands, which is precisely why Campbell went to the trouble of stealing that drive and then engaging in a shell game when told to return it. The FZBL Seagate Portable Drive contains the key information that a competitor would need to steal customers: contact information, service histories, presentations, and whatever else is in the .pst files that Campbell went to the trouble of creating and taking in the days before his resignation. The only way to preserve the value of the trade secrets that Campbell stole is to force him to return them, purge himself of them, ensure that they are not in the hands of any third parties, and prevent the use or disclosure of those proprietary materials.

## FIRST CLAIM FOR RELIEF
### BREACH OF THE AGREEMENT

70.    Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 68 of this Complaint as if fully set forth herein.

71.    As a condition of his continued exposure to the Yokogawa Trade Secrets and the payment of substantial sums in sales incentives to Campbell, Campbell executed the Agreement.

72.    The Agreement is a valid and enforceable contract. Yokogawa provided consideration to Campbell in return for his commitments not to: (a) solicit business from certain Yokogawa customers; (b) solicit Yokogawa employees; (c) use, disclose, or retain the Yokogawa Trade Secrets and other confidential information; or (d) transfer or delete information from Yokogawa's system, software, or hardware in advance of the end of his employment.

73.    Yokogawa has complied with its obligations under the Agreement.

74.    Campbell has breached the Agreement by, among other things: (a) stealing Yokogawa's Trade Secrets from its computer system for competitive reasons; (b) soliciting Yokogawa's customers by telling them that he was "simply changing teams" and that he would reach out to them in January 2023; and (c) deleting the email that he sent to Yokogawa customers.

75.     As a direct and proximate result of Campbell's actions in breach of the Agreement, Yokogawa has sustained and/or will sustain money damages.

**SECOND CLAIM FOR RELIEF**
**DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *ET SEQ.*)**

76.     Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 74 of this Complaint as if fully set forth herein.

77.     The materials on the FZBL Seagate Portable Drive as described above (including email folders, contacts, presentations, and documents regarding Yokogawa's LNG products and services) constitute trade secrets of Yokogawa subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*

78.     The contents of the FZBL Seagate Portable Drive are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.  Yokogawa has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

79.     The contents of the FZBL Seagate Portable Drive are related to products or services used in, or intended for use in, interstate commerce.

80.     Yokogawa takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

81.    Campbell took, refused to return, and likely used and/or disclosed (or plans to use and/or disclose) the information contained in these files and data by improper means in violation of his contractual and other obligations to Yokogawa.

82.    Campbell engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Campbell owed and continues to owe Yokogawa as an agent, employee, and representative of Yokogawa.

83.    Campbell's foregoing conduct constitutes an actual and threatened misappropriation and misuse of Yokogawa's trade secret information in violation of the DTSA.

84.    As a direct and proximate result of Campbell's actual and threatened misappropriation of Yokogawa's Trade Secrets, Yokogawa has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Campbell is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Yokogawa.

85.    As a direct and proximate result of Campbell's misappropriation, Yokogawa has suffered and/or will suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA.

86.    Each of the acts of misappropriation, as alleged in the Second Claim for Relief, was done maliciously by Campbell, thereby entitling Yokogawa to exemplary damages to be proved at trial and recovery of its attorneys' fees.

## THIRD CLAIM FOR RELIEF

### MISAPPROPRIATION OF TRADE SECRETS (TEX. CIV. PRAC. & REM. CODE §134A.001 *ET SEQ.* AND/OR FLA. STAT. ANN. §688.001 *ET SEQ.*)

87.     Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 85 of this Complaint as if fully set forth herein.

88.     The contents of the FZBL Seagate Portable Drive that Campbell created, are trade secrets, pursuant to Tex. Civ. Prac. & Rem. Code §134A.002 and Fla. Stat. Ann. §688.002 because Yokogawa derives independent economic value from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

89.     Yokogawa took reasonable precautions under the circumstances to protect its trade secrets, and the parties with access to its trade secrets (including Campbell) were subject to obligations to maintain their secrecy.

90.     Campbell, as an employee of Yokogawa, had access to information that consisted of Yokogawa's trade secrets.

91.     Campbell willfully and maliciously misappropriated Yokogawa Trade Secrets by, among other acts, taking, refusing to return, and likely using and/or disclosing (or planning to use and/or disclose) Yokogawa's trade secrets without authorization (express or implied) at a time that he knew or had reason to know that he had a duty to Yokogawa to maintain the secrecy and confidentiality of the trade secrets that he used to compete with Yokogawa.

92.     As a direct and proximate result of Campbell's actual and threatened misappropriation of Yokogawa Trade Secrets, Yokogawa has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless he is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Yokogawa.

FP 45995918.4

93.     As a direct and proximate result of Campbell's misappropriation, Yokogawa has suffered and/or will suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the Texas Uniform Trade Secrets Act and/or the Florida Uniform Trade Secrets Act.

94.     Each of the acts of misappropriation, as alleged in the Third Claim for Relief, was done maliciously by Campbell, thereby entitling Yokogawa to exemplary damages to be proved at trial and recovery of its attorneys' fees.

### FOURTH CLAIM FOR RELIEF
#### TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTION

95.     Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

96.     Campbell was an employee of Yokogawa and, in his capacity as employee, had access to Yokogawa's Trade Secrets and confidential information.

97.     Campbell has a wealth of Yokogawa Trade Secrets and confidential information in his head and in his physical possession.  Campbell will likely seek to use that information to move the customers that he serviced at Yokogawa to a competitor.  Additionally, Campbell has retained Yokogawa Trade Secrets and confidential information so that he can use those materials in direct and unfair competition with Yokogawa.

98.     In the absence of injunctive relief, Yokogawa will suffer irreparable harm, including, but not limited, loss of customers and disclosure of customer information to a competitor.

99.     Yokogawa has no adequate remedy at law.

100.    The potential harm to Yokogawa if Campbell is not enjoined is far greater than any harm that Campbell may suffer if injunctive relief is not granted.

FP 45995918.4

101. Yokogawa is likely to prevail on the merits of its cause of action against Campbell.

102. The public interest weighs in favor of granting injunctive relief.

## FIFTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

103. Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 101 of this Complaint as if fully set forth herein.

104. As a result of his misconduct as alleged in this Complaint, Campbell has been unjustly enriched or will be unjustly enriched through: (a) the use of Yokogawa's confidential, proprietary and trade secret information; (b) the soliciting of Yokogawa's customers on his own behalf; and (c) transferring and deleting proprietary information from Yokogawa's computer software, hardware, and/or systems.

105. The retention of these benefits by Campbell under the circumstances is inequitable and, therefore, Campbell should be required to disgorge his wrongful gains, to which Campbell knew that he was not entitled.

## SIXTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY

106. Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 104 of this Complaint as if fully set forth herein.

107. As a high-level manager entrusted with Yokogawa's confidential information, Campbell had a fiduciary relationship with and owed specific fiduciary duties to Yokogawa. For example, after termination of his employment, Campbell is obligated to return and not use Yokogawa's confidential and proprietary information.

108. Campbell breached his fiduciary duties to Yokogawa by, among other things, retaining and failing to return Yokogawa's company property and destroying certain Yokogawa

24

confidential property, which Campbell maintained on the Yokogawa computer system. Campbell also breached his fiduciary duty by soliciting Yokogawa customers in his December 12, 2022 email wherein he told them that he was "simply changing teams" and would be in touch with them in January 2023.

109.    As a result of Campbell's breaches of fiduciary duties, Yokogawa has suffered and continues to suffer injury.

### SEVENTH CLAIM FOR RELIEF
#### ATTORNEYS' FEES

110.    Yokogawa incorporates by reference its allegations set forth in paragraphs 1 through 108 of this Complaint as if fully set forth herein.

111.    Yokogawa is entitled to recover reasonable and necessary attorneys' fees under Chapter 38 of the Texas Civil Practice & Remedies Code because this suit is in part for breach of contract.

112.    Yokogawa is also entitled to recover reasonable and necessary attorneys' fees pursuant to the terms of the Agreement.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Yokogawa Corporation of America requests that this Court provide it with injunctive relief and money damages against Campbell in the following forms:

    a.    A temporary restraining order requiring Campbell and all others acting in concert with him to:

        (i)    refrain from, directly or indirectly, soliciting any Customer (as that term is defined in the Agreement) of Yokogawa with whom he had Contact (as that term is defined in the Agreement) for the purpose of selling or providing any products or services competitive with those offered by the Company;

        (ii)    refrain from, directly or indirectly, soliciting, recruiting or inducing any Employee (as that term is defined in the Agreement) to terminate his or her

employment relationship with Yokogawa in order to work for any other person or entity engaged in the Business (as that term is defined in the Agreement);

(iii)    refrain from retaining, copying, duplicating, using, or disclosing to any third party any Trade Secrets or Confidential Information, as those terms are defined in the Agreement or in relevant statutory language;

(iv)    immediately deliver to Yokogawa all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of Yokogawa;

(v)    make available for inspection and imaging any computers, tablets, smartphones, external storage devices, or personal data devices on which Campbell accessed and/or retained Yokogawa's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which Yokogawa's confidential information could reside; and

(vi)    make available for inspection and imaging any computers, tablets, smartphones, external storage devices, personal data devices, Cloud-based file management accounts, email accounts, or other devices or accounts on which Campbell contacted, attempted to contact or otherwise communicated with any Yokogawa customer for the purpose of soliciting, developing, maintaining or servicing business on behalf of any entity or person other that Yokogawa during Campbell's employment with Yokogawa or thereafter.

b.    A preliminary injunction, enjoining and restraining Campbell and all others acting in concert with him as set forth in Paragraph (a)(i)-(iii) above pending the final determination of this action;

c.    A permanent injunction enjoining and restraining Campbell and all others acting in concert with him as set forth in Paragraphs (a)(i)-(iii) above, subject to the time limits set forth in the Agreement;

d.    An award of actual and compensatory damages in an amount to be proven at trial, caused by Campbell's wrongful acts;

e.    An award of exemplary and punitive damages to be proven at trial;

f.    Pre-judgment and post-judgment interest;

g.    An award of reasonable attorneys' fees and costs incurred in this action; and

h.    Such other relief as is just and proper.

DATED: January 18, 2023

/s/ _____
Stephen J. Roppolo
State Bar No.: 00797939
S.D. No.: 21694

**FISHER PHILLIPS LLP**
910 Louisiana St., Suite 4000
Houston, Texas 77002
Telephone: (713) 292-0150
Facsimile: (713) 292-0151
sroppolo@fisherphillips.com

Michael P. Elkon
Georgia Bar No. 243355
(motion for admission *pro hac vice*
forthcoming)
Lauren S. Frisch
Georgia Bar No. 410927
(motion for admission *pro hac vice*
forthcoming)

**FISHER PHILLIPS LLP**
1230 Peachtree Street, NE, Suite 3300
Atlanta, Georgia 30309
Tel: (404) 231-1400
Fax: (404) 2410-4249
melkon@fisherphillips.com
lfrisch@fisherphillips.com

*Counsel for Plaintiff Yokogawa Corporation
of America*

## **VERIFICATION**

Nicholas Yim states that he is Director, Regional System Sales for Yokogawa Corporation of America, that he has read this Verified Complaint, and that he does hereby certify under penalty of perjury that the facts contained in the foregoing Verified Complaint are true and correct to the best of his personal knowledge, information, and belief.

Yim, Nick

Digitally signed by Yim, Nick
DN: dc=net, dc=ykgw, dc=us,
ou=YCA_NORTHAMERICA, ou=310-
SugarLand, cn=Yim, Nick,
email=Nicholas.Yim@yokogawa.com
Date: 2023.01.18 11:17:13 -06'00'

Signature

01-18-2023

Date